## New Orleans, St. Louis and Chicago Railroad Co. *v.* J. J. Burke.

1. **Railway Company.** *Duty of conductor to protect passenger from insult and injury.*

    It is the duty of the conductor of a passenger train to preserve order on his train; to protect passengers from insult and injury from their fellow-passengers; and, if it be necessary to enable him to discharge this duty, he should stop the train and summon to his aid his fellow-employés on it and passengers who are willing to assist, and eject from the train any person or passenger guilty of disorderly, insulting or threatening conduct; and a failure to discharge this duty, so far as he has the means and power, renders the railway company liable in damages to the insulted or injured passenger.

2. **Same. Evidence.** *Conductor's knowledge of injury threatened, and power to prevent.*

    To render the company liable, however, it must be shown that the conductor had knowledge, or opportunity of knowing, that the injury was threatened, and also that by his prompt interposition he could have prevented or mitigated it; and it must be shown, also, that, with the power at his disposal, namely, his own exertions and the assistance of the other employés on the train and willing passengers, he could have prevented or mitigated it; for all that is required of him is a fair and honest effort, with the best means in his power, to prevent the wrong.

3. **Punitory Damages.** *When allowed.*

    Punitory damages should not be allowed in such a case, unless there has been a wilful refusal or absolute failure to interpose, when called on for assistance, or when the injury occurs in his presence. Weak and inefficient action, not resulting from want of sympathy on the part of the conductor for the person aggrieved, or from indisposition to aid him, may render the company liable to compensatory, but not to punitory, damages.

4. **Damages.** *Compensatory. Exemplary. Case in judgment.*

    In this case, four or five persons in the employ of the railroad company, but not employés on that train, were co-passengers with the plaintiff on a special train, improvised to meet the demands of travel to and from the State fair. They and the plaintiff were riding in the baggage car, and they rudely deprived the plaintiff of his hat; the plaintiff went in search of the conductor to get redress, and informed him of the injury; the conductor went with the plaintiff to the baggage car, and asked for the hat to be returned to the plaintiff; very insulting language was immediately used by one of these parties towards

the plaintiff, and immediately a fight ensued, in which the plaintiff was shot, and the plaintiff, retreating from the car, knocked two of his assailants senseless with a hatchet. The conductor retreated in advance of the plaintiff, so that when the plaintiff reached the platform of the car he found the conductor there. Immediately the conductor hurried the plaintiff through a car window and through several passenger cars, to get him beyond the reach of the assailants, some of whom followed into the car next to the baggage car, and there, after the plaintiff and conductor had left it and not in the hearing of the plaintiff, heaped abusive epithets on him. The conductor did nothing more to quiet the assailants, or to eject them from the car, but left them in the baggage car, where the plaintiff's luggage was, and in the car next to it, to the end of the journey, which was less than twenty miles. The plaintiff was slightly injured, being able to go about the next day, and was not prevented from attending to his business for more than ten days. The jury found a verdict for $6,000 damages. The company did not discharge any of these employés from its service, but promoted one of them. *Held*, that the conduct of the conductor, up to the time of his retreat from the fight to the platform of the car, was such as to render the company liable for compensatory damages; and that his allowing the assailants to continue in the baggage car, where the plaintiff's luggage was, and a part of them to go into a passenger car, and there use abusive language towards the plaintiff, without making any effort to stop it, or to eject these parties from the train, coupled with the fact that the company had not discharged any of the assailants, but had promoted one of them, made a case where exemplary damages were allowable.

5. Exemplary Damages. *Discretionary with the jury.*
   The awarding of exemplary damages is always discretionary with the jury, and an instruction which informs them that under any state of facts it is their duty to award them is improper.

6. Same. *Instructions erroneous. Verdict correct.*
   It is especially desirable that the jury should be correctly instructed as to the awarding of exemplary damages, as to which their finding will not ordinarily be disturbed by the court; but, even where they have been erroneously told that it is their duty to award them, the verdict will not be set aside if the facts were such as fully justified their imposition and the sum awarded is not excessive. In such case the verdict will be attributed to the facts which make it right, rather than to the instructions which would make it wrong.

7. Bonds. *One seal adopted by several signers. Case in judgment.*
   It is not necessary that all the obligors in a bond should seal it with his separate seal. If there be one good seal and several obligors, this seal may be the seal of all of them, if they have adopted it as such.

Whether the recital in the bond, "sealed with our seals," will constitute such adoption, *quære.* But this recital, and, in case of a *supersedeas* bond, an affidavit of an obligor who has no seal opposite his name indorsed on the bond, that he is worth the penalty of the "bond," and his allowing the clerk to issue a *supersedeas* on it as if it were his bond, and his failure to object in the Supreme Court that it is his "bond," until judgment of affirmance is entered on it, do make out this adoption.

ERROR to the Circuit Court of Madison County.

Hon. W. B. CUNNINGHAM, Judge.

A full statement of this case is found in the opinion of the court.

*J. A. P. Campbell,* for the plaintiff in error.

Is a common carrier of passengers bound to protect passengers from injury at the hands of fellow-passengers? Or is the full duty of a common carrier discharged by carrying safely as to all else but injuries from fellow-passengers, and does a passenger take the risk of what may befall him in any other way than by the omission or commission of the carrier or his employés?

The obligation to provide suitable and safe carriages and good road-bed (in case of a railroad), and competent and vigilant servants, and to guard, as far as human foresight and prudence enable, against mishaps and injuries to passengers, from the mode of transportation, is conceded. But when the carrier has done this, has he not done all he is required by his position and duty to do? Can a passenger complain of the carrier because of an injury suffered at the hands of a fellow-passenger, having as much right on the train as he who was injured? Does not every passenger know that the risk of accidents and injuries from the negligence or misconduct of fellow-passengers is one of the ills of the lives of those who travel in great thoroughfares, on which are found all classes of men, the bad as well as the good, all with equal rights so far as the carrier is concerned? How far must the conductor of a train act as a policeman? When shall he interpose? Shall he arrest one who is intoxicated, or enraged and noisy? What must he do with him after arresting? Must he invade the rights of one who has paid his way, and hazard a suit by him

in order to preclude the possibility of some injury to somebody, and a suit for damages by him? It must be apparent, from the delicacy and difficulty of the situation, that if a company is ever responsible to passengers for an injury by a fellow-passenger, it must be only in those cases where outrageous conduct by one passenger, threatening harm to other passengers, is brought to the notice of the conductor, and he, perceiving danger to others, fails to interpose. It must be an aggravated case of *wilful* neglect to warrant a recovery from the carrier in such case. The threatening conduct of him who occasioned injury must be so unmistakable as to make it clear that he thereby forfeited his right to be carried (otherwise he cannot be justifiably put off), and it must appear that there is reasonable ground to apprehend that others are endangered by his threatening attitude; otherwise, the carrier will be made responsible for what neither he nor his servants did, and for what they had no reasonable ground to anticipate in the conduct of another. Men will drink on railroad trains and steamboats; no law prohibits it. The Constitution secures the right of travel on all public conveyances against infringement or abridgment. Con. Miss. art. 1, § 24. And it secures against being deprived of liberty, except by due process of law. Con. Miss. art. 1, § 2. And it entitles all to bear arms. Con. Miss. art. 1, § 15. The statute specifies the cases in which arrests may be made without warrant, and requires that the offender shall be taken before a magistrate. Code 1871, § 2776. At what time and on what ground shall a conductor interpose to confine a freeman or to eject him from his train? Certainly not until the person becomes dangerous to others; and just at the moment when the right accrues to the conductor, as a policeman, to seize and bind him, " being a Roman and uncondemned," or to put him out of the car, he may fire a pistol (or drop it from his pocket, where he has a right to have it), and injure some one; and shall the carrier be responsible? If the conductor were *wrongfully* to interfere, the company would be answerable to the outraged passenger. If the conductor waits until his right to interfere is clear, and his duty to do so made apparent, it may be too late to prevent harm to some one; and shall the carrier be held liable there?

Hard is the case, if, in addition to the rigid responsibility of common carriers of passengers in reference to all else, they are also to steer so exactly between Scylla and Charybdis as to render being engulfed and ruined by one or the other almost certain.

The idea of a passenger being entitled to look to the carrier for protection against a fellow-passenger was never advanced until a late day; and the doctrine, as announced in several late cases, is not sound, nor suited to our condition. The case in 53 Penn. St. 512, is first in point of time of the several cases which announce the new doctrine. This dates in 1866, and was pronounced a " novel case " by Woodward, C. J., an appellation it deserved, both for the unprecedented character of the claim, and the enactment by the court of a rule to suit the " impressions " on the minds of the judges. Not an authority is cited; none could be. Not a principle is stated, except that " if the conductor did not do all he could to stop the fighting, there was negligence; " and the conclusion rests on the declaration that there was negligence on the part of the conductor. This was an extreme case, for it seems the conductor busied himself " with collecting fares in forward cars whilst a general fight was raging in the rearmost car, where the lady passengers had been placed;" and the gallantry of a Pennsylvania court could not stand that. In the case at bar the ladies were in front cars, and there was no general fight nor particular one, except what sprung up suddenly and unexpectedly, while the conductor was doing all he could to get Burke's hat.

The rioters in the Pennsylvania case were not passengers and had no rights on the train, were intruders and liable to be expelled. It was a " mob," and there was no question of the right of the conductor to expel them. Even according to this case the last instruction asked by the plaintiff in error should have been given.

But does not the opinion in that case announce the rule too broadly in saying " they undertook to carry the plaintiff safely "? Is it true that a carrier is an insurer, absolutely, and against everybody and thing, of the safety of passengers? Does the right of the passenger extend beyond the right to be

safely transported, so far as the acts of the carrier are con-
cerned? Is it not the universal apprehension of the learned
and unlearned that no right exists to claim protection at the
hands of the carrier against wrong from any but the servants
of the carrier?

On what rests the liability of the carrier for injuries by fellow-
passengers? It is not upon the doctrine *respondeat superior*, for
there is no such relation between the passenger and carrier as to
make the latter responsible. No court has held that the carrier
must furnish a police force to keep the peace, and such a thing is
impracticable and unwarranted. Until the passenger has for-
feited his right to be carried, the conductor dare not put him
off. The only principle on which a carrier can be held liable
for an injury to a passenger is, that it has neglected to do
something it was in duty bound to do. Culpable neglect to
interpose in a clear case of duty to interfere, and unmistaka-
ble forfeiture, by the passenger threatening the safety of others,
of his right to have his contract for carriage carried out, and
this brought to the knowledge of the servant of the carrier,
must concur to make the carrier responsible, if in any case
it is responsible for such injuries. The true view is, rigid
responsibility by the carrier for all that pertains to safe car-
riage of passengers, immunity from wrong by servants of the
carrier, and reliance by the passenger for protection against
wrong or injury from his fellow-passengers, on his own pru-
dence, caution, skill and manhood, and on the law, which
will visit civilly and criminally him who harms his fellow-pas-
senger. It is strange it was never heard of until recently that
a carrier is charged with the duty of protection to passengers
from fellow-passengers! There is no mention of it in England
or America until lately, although for half a century or more
railroads and vessels have transported millions of people. True,
the common law is flexible and adaptable to the increasing
exigencies of growing societies; but we seek in vain for any
principle of the common law, as to carriers, on which this new
doctrine can rest. The doctrine of evolution is applicable, in
a certain sense, to the common law; but every new application
must be of an established principle, or an extension of princi-
ples to new states of fact. It should be a process of develop-

ment. Old principles may grow and develop, but it must be a development, and not a manufacture by the courts. Where there is no principle of law applicable to a given case, however desirable it may be that there should be, it is for legislative power to supply the want; and it should not be done by judicial enactment, as was done in the several cases relied on to sustain the liability of the carrier for protection to his passengers from fellow-passengers.

The judgment should be reversed because of the erroneous instructions to the jury.

*Harris & George*, on the same side, made an elaborate argument on the facts, and then proceeded to discuss the law of the charges given for the plaintiff, as follows : —

The second charge makes it the absolute duty of the railroad company under all circumstances to protect passengers against violence and insults of strangers and co-passengers, and declares that it " must " do so. This is a duty imposed by this instruction, which no human agency, as yet, has been able to discharge. The best government only affords protection in ninety-nine cases in a hundred, not by having a police-officer to protect from wrong, but by punishing the offender afterwards. A railroad company has no power of punishment; can neither indict, try nor convict. The third charge makes the defendant liable for the assaults and insults of its servants, under all circumstances, whether they are acting in the course of their employment or not, provided only the person assaulted was a passenger on the defendant's train ; and they are liable also for exemplary damages. This charge, like the last, makes the duty of affording protection *absolute*. It does not absolve the defendant from responsibility if the conductor did all in his power to protect. The exemplary damages will be noticed hereafter. The fifth charge gives no principle of law for the guidance of the jury. The only effect of this charge would be to cause the jury to strain a point to convict the defendant as a matter of public policy. But it is wrong abstractly, so far as this case is concerned. It asserts that carriers using steam are bound to furnish a greater degree of police protection than others. How the duty of affording police protection is affected by the agency with which the carrier propels his carriages cannot be perceived.

The sixth charge has no application to the case. It refers alone to injuries done by the agents and employés of a railroad company. The question in issue here was not as to an injury done by the company, but as to its failure to protect the plaintiff from injury threatened by another.

The seventh charge is wholly wrong for the following reasons : It is a charge upon the general duty of the defendant to police the train, and then makes the defendant liable in exemplary damages to the plaintiff for a failure to discharge this general duty in every respect, without suggesting to the jury in the remotest way the consideration of the most important matter in issue, which is, that the plaintiff's right to recover depended on showing that he was injured in consequence of, or as a result of, this negligence. We have shown that the injury was unavoidable, so far as the act of the conductor was concerned ; yet this charge makes the company liable notwithstanding this, if only the conductor failed in some respect to do his general police duty, when such failure had nothing whatever to do with the plaintiff's injury. And this meaning of the charge is made still more manifest by the reference to the conductor's collecting fares, when at that time, as is shown, there was not the slightest reason to believe that delay would injure the plaintiff, as in fact it never did. The eighth charge is wholly wrong. It commits the egregious blunder of laying down the same strict rule in reference to the exercise of the police power of the company as the law affixes for running the cars and keeping the road in order. It is laid down that the company must use the utmost care, caution and prudence to preserve order, &c., on the train. This would require, as a matter of course, that the company should employ a large police force, — at least one for every passenger on the train, — to prevent insult and abuse to a passenger. Of course no such duty is imposed by law. The railroad companies are not agencies of government to enforce its police powers.

The jury, in the third, fourth and seventh charges, are directed, as matter of law, to award exemplary damages.

*Southern Railroad* v. *Kendrick*, 40 Miss. 374, shows this to be error. It should have been left to the jury for their action. And not only this. When so left, the rules of law regulating

the allowance of such damages should have been explained to the jury. *Memphis Railroad* v. *Whitfield*, 44 Miss. 466.

But this was not a case for the allowance of such damages, under any event. There was no oppression, insult or abuse by the conductor. If he were guilty of any negligence at all, it was *levis culpa. Southern Railroad* v. *Kendrick*, 40 Miss. 374 ; *New Orleans Railroad* v. *Statham*, 42 Miss. 607 ; *Memphis Railroad* v. *Whitfield*, 44 Miss. 466.

It will be insisted, we learn, that the instructions cannot be considered, because they were not specially excepted to. They are marked by the clerk, with his name signed thereto, as given. Since 1849, it has been settled that no special exceptions are required in such a case. *Watson* v. *Dickens*, 12 S. & M. 608, 613. In *Mayer* v. *McClure*, 36 Miss. 390, 402, it is said : " The record shows that the instructions were severally marked, given, or refused under the statute, and so were made a part of the record. No exceptions were taken to the instructions at the trial. They were relied on in the motion as cause for a new trial." The court then quotes *Phillips* v. *Lane*, 4 How. 122, *McRaven* v. *Mc-Guire*, 9 S. & M. 34, and *Field* v. *Weir*, 28 Miss. 68, to show that this was sufficient, and then says : " It seems, therefore, to be settled by the decisions of this court, that instructions which appear in the record to have been 'given' or 're-fused,' are always open for consideration on a motion for a new trial." And then, at the end of the case, it appears that a *venire de novo* was awarded for erroneous charges. In that case, the record with reference to the charges was exactly like the case at bar.

*Banny* v. *Scherling*, 40 Miss. 320–329, is exactly in accordance with the above, except that it explains more fully the practice. According to that case, charges, though duly certified, are not considered as excepted to from that cause alone ; but they are a part of the record, and, if erroneous, they can be excepted to on the motion for a new trial. If so excepted to, by being assigned as ground for a new trial, the court here, in considering the propriety of the judgment on the motion, will look into the charges given and consider them ; but if no bill of exceptions be taken, except to the judgment on

the motion, then, as the statute requires the grounds of the motion to be set out in the motion, the court will look into no other grounds than those assigned; and, of course, if the granting or refusing charges be not assigned as grounds for the motion, they cannot be considered.

The motion for a new trial in this case set out specifically, as grounds for the motion, the giving of these charges for the plaintiff; and we are thus brought clearly within the strictest rule ever laid down.

*A. H. Handy*, for the defendant in error.

I. The first error assigned consists of objections taken to the second, third, fourth, seventh, eighth, and ninth instructions given for the plaintiff below.

1. The second instruction was clearly right, that the railroad, as a common carrier, was responsible not only for the wilful misconduct of its agents and servants, but was bound to protect its passengers against the violence and insults of strangers and co-passengers. And the seventh and eighth instructions for the plaintiff point out how this duty of protecting passengers against violence and insult is to be performed, to wit, that the conductor must at once do all he can to quell the fighting or disorder, and, if necessary, stop the train, call to his aid the engineer, fireman, brakemen and willing passengers, lead the way himself and expel the offenders, or demonstrate by an earnest experiment that the undertaking is impossible.

This rule is manifestly correct. It necessarily results, from the obligation of the carrier to carry the passenger safely, that the carrier should employ all the means in his power to protect the passenger from violence and danger to his person. Such means are within his power: to stop the train, call on the subordinate agents of the company, who are within the power and subject to the control of the conductor, and willing co-passengers, to aid him in the discharge of his duty. He has control of the train, and is the only person capable of fully affording this protection to those whom he is bound to carry safely and protect from threatened violence and outrage. If he fails to perform this duty, the company thereby becomes liable for any injury sustained by the passenger in his person or property. *Goddard* v. *Grand Trunk Railway*, 57 Me.

202; *Pittsburgh Railway* v. *Hinds*, 53 Penn. St. 512.    On this principle rest all the cases decided in this court upon the liability of railroads for injuries sustained by passengers by reason of the negligence of conductors and other agents, from that of *Vicksburg Railroad* v. *Patton*, 31 Miss. 156, throughout our reports.

The objection, that this duty to give protection is absolute, and whether the conductor has the means, or has employed them ineffectually or not, according to the second instruction, is met and removed by the seventh and eighth instructions, qualifying the second, and stating fully the duty as to the officer's efforts to give relief and perform his duty; and, upon grounds hereinafter stated, this objection is obviated.    No objection having been made to the instruction on the trial, even if it were erroneous, it was not sufficient ground for new trial, when first raised on the motion therefor, and is not ground of reversal here, because the verdict on the evidence was clearly right.

2. The objections urged to the third and fourth instructions for the plaintiff appear to be hypercritical, in applying these instructions to wrongs done by the agents or servants of the company, whether engaged at the time in its employ or not, and that such liability will arise from any wilful misconduct or negligence of the agents or servants of the company towards a passenger.

These propositions are undoubtedly correct, as to the liability of the company for such conduct and acts on the part of its agents.    It was matter of evidence whether the persons implicated were agents of the company at the time of the grievances committed by them.    But the rules, as laid down, are clearly correct as principles of law.    It is also certainly true that the company is liable for any such wilful acts by its agents then acting in its service, especially when sanctioned by the company, as was done in this case.

3. The fifth instruction for the plaintiff was not excepted to on the trial, nor stated as ground for new trial in the motion made therefor.    It is not, therefore, subject to objection in this court.    And the sixth instruction stands in the same way.

4. The seventh and eighth instructions are the main grounds of error relied on by both of the briefs for the plaintiff in error here.

Notwithstanding the objections of both the learned counsel for the plaintiff in error, it is confidently submitted that the rules stated in these instructions are well founded in the principles of law applicable to the relations and duties of railroad companies and their agents and managers, and are just and salutary for the protection of persons who are under their charge for pay and who, from the nature of the thing, must be mainly dependent upon them for protection from insult, violence and outrage.

The duty safely to carry the passenger plainly renders it the duty of the company and its servants acting at the time, not only to do no wrong or personal injury to the passenger themselves, but to protect him against the violence and insults both of other passengers and, *a fortiori*, of their own servants and employés.  Otherwise, in a railway car subject only to the order and power of the conductor and when the passenger is without adequate means and control over the car and servants to protect himself, the passenger is subject to insult, violence and bodily harm without restraint upon his assailants; and, unless the officer in charge exerts his authority to protect him, he is at the mercy of rowdies and ruffians for personal violence or deprivation of his property, or for open insult and oppression.

In such cases, it plainly results from the position of the company and its officer in charge, as the proprietors and controllers of the establishment and under their general duty safely to carry the passenger, to give him all necessary protection, in person and property, against violence and unlawful assaults upon him.  And the means clearly within his power, in such cases, are justly and properly stated in these instructions; and, if the agent neglect to employ them in the exigency, his negligence will render the company liable for the damage resulting from the grievance.

The railroad impliedly warrants that its conductor, engaged in running its trains, is possessed of due skill and is competent and faithful, and the company is liable, under all circumstances, for any injury occasioned by the misconduct, rashness or negligence of such agents; and when the injury is caused by gross negligence or wanton and wilful misconduct of its employés, it is liable for exemplary damages.  See cases cited

in George's Dig. 595, pl. 37 ; *Philadelphia Railroad* v. *Derby*, 14 How. (U. S.) 468, 486 ; *Steamboat* v. *King*, 16 How. (U. S.) 474.

Besides the general principle on which this rule is founded, and which is the foundation of nearly all the cases in this country, holding such companies liable for the neglect of duty by agents, the liability is fully held, in the particular kind of cases set forth in these instructions, in two well-reasoned cases, one in Pennsylvania and the other in Maine.  *Pittsburgh Railway* v. *Hinds*, 53 Penn. St. 512, and *Goddard* v. *Grand Trunk Railway*, 57 Me. 202 ; and in the case of *Flint* v. *Transp. Co.*, 34 Conn. 554, the carrier of passengers was held to exercise the utmost vigilance and care to guard passengers from violence from whatever source arising, and liable for his neglect in exemplary damages.  See the principle fully sanctioned in *Philadelphia Railroad* v. *Derby, ubi supra ; Vicksburg* v. *Patton, ubi supra ; Pennsylvania Railroad* v. *Vandiver*, 42 Penn. St. 365.

The delicacy often required in the exercise of this power and duty, and the difficulties often incident to the officer's action, are not reasons sufficient to absolve him and the company from liability in a case where his failure to do his duty and protect the passenger are shown by evidence.  If so, all liability for neglect of official duty in delicate or difficult circumstances would be avoided, and there would be an end to the protection thrown around the citizen by law against neglect by officers to perform their public duties, and in giving protection to the helpless committed to their care.

Against this rule the argument from inconvenience may be strongly urged to commend to the court the sanction of the general rule laid down in these instructions, as a protection to peaceful and law-abiding men, travelling in these chartered conveyances, against the assaults and violence of lawless men and ruffians.  A reasonably rigid rule of responsibility, it is submitted, is much more safe and salutary for the public protection than one tending to lower the rule of accountability in such cases.

The performance of the duty here stated would not require a " large police force, at least one for every passenger," to keep order, as suggested by adverse counsel.  All that these

instructions require is, that, in these cases, the conductor should stop the car, call upon the employés on the train and passengers willing to assist, and do all he could to expel the disorderly persons, and to protect the injured passenger, — a duty easy to perform, and requiring nothing for it but firmness and fidelity of the officer to his trust, — which, by all the authorities, the company guarantees to the passenger in taking his passage money.

We insist that the rule of duty and protection to the passenger, stated in these instructions and supported by the cases above cited, is not a new principle of law, but the mere application of a settled rule of liability of carriers of passengers, founded in the very nature of the obligation, and as old as the law of common carriers: see 1 Smith's Leading Cases, (Amer. ed. 1855) 328; 1 Wall. Jr. 2; 9 Met. 1; *Coggs* v. *Bernard*, 2 Ld. Raym. 909; and constantly recognized and applied in every form, to give protection to the passenger against the negligence of the carrier or his agents, to whom the passenger's safety and protection are necessarily intrusted, and who undertakes for pay to perform that delicate duty.

The ninth instruction for the plaintiff does not appear to be objected to by counsel for the plaintiff in error, and was clearly proper.

It must not escape observation that, so far as the instructions given for the plaintiff were calculated to prejudice the jury as to the matter of the conductor doing all he could to prevent the injury to the plaintiff, &c., the disorderly persons who committed the wrong were not employés on that train; that the company was not responsible for their acts as its employés, though they were employed on other trains and service; that the plaintiff, by his own acts, contributed directly to bring about the difficulty, and hence that there was no wrong on the part of the defendant. In all these points the instructions, 1, 2, 3, 4, 5, for the defendant, qualified any thing stated generally in the plaintiff's instructions touching these questions, and thereby prevented any possible prejudicial effect in these respects, that the instructions for the plaintiff could have produced.

5. The sixth instruction asked by the defendant was properly refused, for the following reasons: —

(1.) Although the fight occurred suddenly and unexpectedly to the conductor, and he then did what he could for Burke's protection, but without success, no reason was thereby furnished why he should not call for assistance from the employés and others, who, the evidence shows, were willing to aid him in expelling the desperadoes from the car, and to that end should not have stopped the cars.

(2.) The stopping of the train and expelling them was a duty plainly called for by the emergency for Burke's protection, not so much at the time of the rencounter, which was sudden, and Burke was removed from them, but because they afterwards continued their threats of violence and vengeance, and were at large in the cars, and permitted to continue their abuse and threats to kill him, unrestrained by the conductor. This was a continuation of the violence and outrage against him; and such was the continuing danger to him, that the conductor had to remove him from his place of sitting, taken when he entered the car, and from his luggage and apparatus, and place him in duress, in order to be safe from the infuriated ruffians, thereby imprisoning the unoffending, and permitting the violators of law and right to continue their violent course. This was an outrage on the part of the conductor, whose duty it was to stop the train and expel these men in order to the safety and protection of Burke. It was not only his duty to "do what he could" for Burke's protection at the time of the fight, but afterwards to protect him against the abuse and threatened outrages, and to allow him the privileges of a free and lawful passenger during the trip, and to that end to expel these lawless men from the train, by stopping the train, and by the force at his command. Yet this instruction denies this duty.

(3.) It is improper, in stating that the company was not responsible, if the conductor was powerless to check the fight, if the best way in his power at the time was to get Burke away and he did his best to do that. This might have been a sufficient reason for his getting Burke away from the fight; but it was no excuse for his failure to prevent a continuation of the men's violence subsequently, by expelling them from the train, or using all the means within his power to do so, which, for aught that appears, were ample, if he had made any effort to use them. His mode of doing this was to put Burke in duress,

and allow the ruffians to go through the cars and curse him, threatening his life, which, according to this prayer, was a sufficient discharge of his duty to afford safe passage and protection to Burke.

II.   The next question is as to the instructions for the plaintiff in relation to exemplary damages.

The third and seventh instructions, we do not deny, would have been ground of error, if they had been objected to at the time, and special exceptions taken to them, so that, if complained of, the error in them might have been corrected by the court.   If that course had been taken, the exception would have had its full, technical force, as matter *stricti juris*, and would have been *per se* sufficient ground ' for reversal in this court.

But the objection was not then made, and was first raised on the motion for new trial, and, so presented, it loses much of its force as a matter of rigid law; and the true question for decision in this court, upon the motion and exceptions taken thereto, is, whether the judgment, upon review of the whole record, was wrong, and should be reversed.

We submit that the affirmative of this proposition cannot be maintained, for the following reasons: —

1.   Upon the whole record, the jury were properly instructed as to the matter of exemplary damages.

It is true that the third and seventh instructions, in general terms, direct the jury that, upon the state of facts therein stated, they "will find for the plaintiff, and award exemplary damages."

But the fourth instruction directs them that "the defendant was liable to exemplary damages for any wilful misconduct or negligence on the part of the defendant's agents or servants towards a passenger, and in awarding damages they were not confined to the proof of actual damages, if the evidence warrants exemplary damages."   Thus the generality of the third and seventh instructions was clearly explained and their improper effect obviated.

But all doubt is removed, and every prejudicial effect obviated in these instructions, by the ninth instruction, granted for the plaintiff, as follows:   "That if they believe from the evidence that the plaintiff is entitled to recover

any thing in this case, they are not limited to any particular specific amount, but may find punitive damages, if they see fit; if they believe from the evidence that Burke was insulted or assaulted while on the train, either by one of the employés of the company, or by a passenger, or by a stranger, if the assault was the result of carelessness or negligence on the part of the employés of the road, on this given occasion, or any failure to give Burke protection at the time of the injury."

By this and the fourth instruction the question of the discretion of the jury as to awarding exemplary damages was fully and properly submitted to the jury and the general terms of the third and seventh instructions were qualified, so that the jury, taking all the instructions together, were so directed that they could not be misled.

It is well settled in this court that all the instructions given in a case are to be taken together, and to constitute the law declared by the court to the jury in the case. 10 S. & M. 25; *Mask* v. *State*, 36 Miss. 77; *Evans* v. *State*, 44 Miss. 762, 775. Although one instruction is erroneous, yet, if another on the same subject states the rule of law correctly, the error in the first is corrected in the other and there will be no error which will justify a reversal in this court. *Evans* v. *State*, *ubi supra; Lamar* v. *Williams*, 39 Miss. 342, 346.

2. But even if there was error in the third and seventh instructions, the verdict was manifestly correct, upon the whole case made by the record; and, upon a motion for new trial, or writ of error taken thereupon, as this is, the error is not ground of reversal, for the judgment is right and fully sustained by the evidence. 40 Miss. 191; 35 Miss. 533; 42 Miss. 607; 44 Miss. 466. The question here is not whether the verdict is clearly right, but whether it is manifestly wrong; and a reversal cannot be made, unless it be shown by the plaintiff in error that the verdict was plainly wrong. 13 S. & M. 656; 30 Miss. 369; 36 Miss. 458; 43 Miss. 538. This is also a sufficient answer to all the other objections taken to the plaintiff's instructions.

3. It is plain that the rule as to exemplary damages was treated on the trial by the defendant's counsel as properly stated in the fourth and ninth instructions qualifying the third

and seventh instructions; for no instructions on the subject were asked by the learned counsel for the defendant on the trial, Judge Campbell, and no point is made by him as to these instructions in this respect in the brief filed here by him for the plaintiff in error. This shows that the instructions upon this point were acquiesced in both in the court below and here, by the learned counsel who tried the case below. The point is not, therefore, to be raised for the first time in this court, a rule well settled in this court. *Coulter* v. *Robertson,* 14 S. & M. 18.

III. The record clearly presents a case proper for exemplary damages, and the evidence abundantly justifies the verdict as to amount.

1. Gross neglect of duty, especially a public one, like that of a railroad charged with high duties to the public, resulting in great injury or oppression to a passenger, will justify exemplary damages. 44 Miss. 466, 494, citing and approving 13 How. (U. S.) 363, 371, where the rule is clearly stated by the Supreme Court of the United States. *Vicksburg Railroad* v. *Patton,* 31 Miss. 156, 198, and numerous other cases. This is especially true, where the neglect is wilful on the part of the carrier or his servant; same authorities; *Goddard* v. *Grand Trunk Railway,* 57 Me. 202, and cases cited there, and in the note of Judge Redfield to that case in 10 American Law Register, N. S. 33; *New Orleans Railroad* v. *Hurst,* 36 Miss. 660; *Heirn* v. *M' Caughan,* 32 Miss. 17; *Southern Railroad* v. *Kendrick,* 40 Miss. 374, 390. In the last case the court says: " A neglect of duty, clearly not attended with any circumstances of insult, of aggravation of feelings, of injury to the person or his property, or of bodily or mental suffering, would not justify vindictive damages; yet if there be any evidence tending to show such circumstances, its force and weight rest peculiarly with the discretion of the jury." *Southern Railroad* v. *Kendrick,* 40 Miss. 390. This is fully sustained by all the cases in this court and by the numerous cases cited in the court's opinion in 10 American Law Register, and in Judge Redfield's note, cited above.

Where there is any such evidence, from the nature of the thing its weight and force must rest with the jury almost exclusively; and the amount of damages to be awarded must

necessarily be matter of discretion to be determined by them.
44 Miss. 493 ; *Goddard* v. *Grand Trunk Railway, ubi supra,*
and cases cited ; *Vicksburg Railroad* v. *Patton, ubi supra ; New
Orleans Railroad* v. *Hurst, ubi supra ; Heirn* v. *M' Caughan, ubi
supra;* George's Dig., title "Damages," art. 22.

2. The testimony fully justified the jury in finding that the
conduct of the conductor was a wilful neglect of his duty to
protect Burke from violence and outrage, commenced and
continued against him, resulting in his oppression and suffer-
ing of great bodily harm and distress of feelings, from which
the conductor took no such steps as the emergency required
to deliver or protect him.

Upon the whole case, we submit that the judgment is most
just and righteous, and should be affirmed.

CHALMERS, J., delivered the opinion of the court.

The plaintiff below (defendant here) recovered in the Circuit
Court of Madison County verdict and judgment against the
defendant railroad to the amount of $6,000, for damages sus-
tained while a passenger on its train at the hands of some fel-
low-passengers.

The facts of the case, as stated by the plaintiff, and as seem-
ingly indorsed by the verdict of the jury, are as follows: The
plaintiff, a photographer by profession, embarked, with his bag-
gage and apparatus, on the cars of the defendant at the depot in
the city of Jackson, *en route* for Canton.   The train was a spe-
cial one, improvised between the two towns for the convenience
of persons attending the State fair, which was then in session
at the capital.   There was a large crowd on board, and the
plaintiff, by permission of the conductor, located himself with
his luggage in the baggage car, which was the rearmost car of
the train, farthest from the engine.   The train started about
dark, and, just as it was leaving, there entered the baggage
car four or five men, drunk, disorderly and boisterous.   They
were all, with one exception, railroad employés, but not
attachés of this particular train.   They were brakemen on
freight trains and section hands on other portions of the road,
who had been attending the fair, travelling on employés'
passes.   They at once commenced to ply the plaintiff, who was
an entire stranger, with idle and impertinent questions, to all

of which he answered civilly.   At length, one of them rudely pulled off the plaintiff's hat, and passed it from one to another of his companions.   The plaintiff, rising up to leave the car, was caught, and pulled violently by the arm.   Disengaging himself, he left the baggage car in quest of the conductor, whom he found in the adjoining car, engaged in taking up tickets. He informed the conductor that he had been insultingly treated, and that his hat had been taken from him, and requested that it might be restored.   The conductor replied that he was going in that direction taking up tickets, and that, if the plaintiff would wait until he reached the baggage car, he would see him righted.   Accepting this assurance, the plaintiff walked to the end of the passenger car nearest to the baggage car, and, standing there, saw his late assailants engaged in eating some fruit which he had procured to carry to his family. In about fifteen minutes, the conductor came to him, and together they proceeded into the baggage car.   The plaintiff held in his hand a hatchet, which constituted a part of his luggage, and which he had held continuously in his hand since his first embarkation on the train.   As they entered the baggage car, the conductor said, " Gentlemen, this gentleman says that some of you have got his hat, and that you have insulted him."   One of the men addressed then handed or tossed the plaintiff's hat to him, and, at the same time, another of the number asked, " Who do you say has insulted you ? "   The plaintiff replied, " All of you have insulted me."   The man answered, " You are a d—d liar ; " and then sprang at the plaintiff, and, aided by one of his companions, began to beat and kick him, the others, in the mean time, closing around and cursing him.   The conductor called out, " Gentlemen, for God's sake, don't get me into trouble ; " and then precipitately abandoned the car, carrying with him his lantern, and leaving the parties in comparative darkness.   The plaintiff, pressed upon by his foes, retreated backwards towards the door, fighting back with his hatchet.   Two of his antagonists he felled senseless to the floor.   His arm was rendered nerveless by a kick, and fell to his side ; and, just as he reached the door, he was fired upon with a pistol, and slightly wounded in the thigh.   Escaping from the baggage car, he found the conductor on the platform without, greatly excited and alarmed, and by him was hurriedly

conducted forward through several passenger cars, and finally located in the one nearest the engine.   Such was the haste of the conductor, that, finding the door of one of the cars difficult to open, he threw up a window, and he and the plaintiff crawled through it.   Two of the rioters subsequently came into the passenger car adjoining the baggage car, and, in the presence of the conductor and of the other passengers, violently cursed and abused the plaintiff, threatening thereafter to kill him.   The plaintiff, however, was not in this car, and did not hear this language.   The train was not stopped at all during these disturbances, nor was any attempt made to quell or eject the rioters.

The plaintiff was not seriously injured.   He was able to walk about the streets the day after the attack, though he could not return to his business for ten days.   The railroad company, of their own motion, subsequently investigated the affair, but did not discharge any of the parties engaged in it.   Indeed, it appears that, after the investigation, and before the trial, one of the principal actors in the assault was promoted from the position of brakeman to that of conductor of freight trains.

Conceding that the parties who committed the outrage are to be regarded as fellow-passengers with the plaintiff, and not as servants of the corporation, — because, though servants, they were not so employed upon this occasion, — the grave and important question is presented, whether a railroad company is charged with the duty of preserving peace and order on its trains, and, if so, whether it is liable for injuries sustained by a passenger at the hands of a fellow-passenger, in consequence of a failure on the part of the agents of the company to discharge this duty.

This question is almost as novel as it is important, and far-reaching in its practical results.   It is of first impression in our State, and lacks but little of being so in American and English jurisprudence.

Three cases only have been called to our attention as distinctly announcing the doctrine of the liability of the carrier for failing to protect the passenger from the assaults of his fellows.

Of these, we may remark that the first in point of time (*Pittsburgh Railway* v. *Hinds*, 53 Penn. St. 512) occurred so

recently as 1866, and is but meagrely considered; that the second (*Flint* v. *Norwich Transportation Co.*, 34 Conn. 554) was but the charge of a United States circuit judge to a petit jury; that in the third (*Goddard* v. *Grand Trunk Railway*, 57 Me. 202) the remark of the learned judge, which is relied on as asserting the doctrine, was manifestly *obiter dictum*, since the injury complained of in that case had been inflicted, not by a fellow-passenger, but by a servant of the corporation while in the discharge of his duty as such.   The absence of any adjudicated cases in England or America previous to those referred to, and the failure to find any positive enunciation of the doctrine in any text-book before those decisions were rendered, would seem to furnish a strong argument against its adoption here; and this view is pressed with great zeal and ability in the briefs of counsel for the appellants.   It is urged with much force that it is incredible that such a doctrine could have slept so long undiscovered and unsuspected in the body of the common law, amid all the learned and exhaustive discussions touching the rights and liabilities of common carriers which have marked the history of our jurisprudence, and that, though common carriers have been engaged for more than a hundred years in transporting millions of passengers, it remained for the Supreme Court of Pennsylvania, less than ten years ago, to discover that the carrier is the protector by law of each passenger against the malice, the brutality, or the drunkenness of his fellow-travellers.   It is said that the carrier occupies no such position of insurer towards passengers as he does towards freight; that as to them he is not bound for all casualties, save those sent of God or of the public enemy, but that, on the contrary, being human beings, endowed with rational faculties, they must protect themselves by the aid of the law against every thing save acts of commission or of omission on the part of the carrier and his servants; that the carrier has discharged his whole duty towards the passenger when, having provided all the necessary appliances for his safe and speedy journey, he takes care that he is not molested, injured, hindered, or delayed by any misconduct or negligence on the part of himself or his agents.   It is further urged, that to exact of the carrier and his servants the duty of investigating the merits of rencounters occurring

between passengers, of deciding upon their merits, and of lending the power of their authority to the one or the other party, is to devolve upon them a duty alike foreign to their business and unsuitable to be discharged by them ; and, in addition, that these *quasi* judicial functions must be discharged under the penalty of deciding correctly in each case, or of subjecting themselves to heavy damages for an erroneous decision. Thus it is said that in the case at bar the men whom we have stigmatized as rioters denied having insulted the plaintiff, and claimed that his hat had been taken in a good-humored and playful joke. If the conductor, in the first instance, accepting the plaintiff's complaint as well founded, had ejected the men from the car, and it had turned out that their version of the matter was true, the company might have been mulcted in damages in a suit brought by them ; and so it is said, if this duty of interference and this penalty for non-interference is imposed upon the servants of common carriers, it will impose the most important and delicate responsibilities upon a class of men wholly unfitted to discharge them, but which they must undertake, though the penalty of erroneous judgments may be the financial ruin of their principals.

Though impressed with the cogency and weight of this reasoning, we are compelled to say that it fails to satisfy our minds. That a court is called upon to administer relief in a case for which no parallel can be found, is undoubtedly good ground for hesitation, care and caution ; but the question, after all, must be, Has a meritorious case been presented, and is the doctrine invoked fairly deducible from the established principles of the law ? If so, we must follow logical premises to their legitimate conclusions, even though it leads to novel applications of old doctrines. It is, indeed, the boast of the common law, that, unlike the written codes of other systems, it is not compelled to point to express and dogmatic enactments to justify every case, but that it contents itself with laying down broad, general principles, and leaves its ministers to mould and apply them to the ever varying and constantly expanding necessities and inventions of man.

Nowhere has this wise and beneficent doctrine been more strikingly displayed than in the application of the ancient

principles of the law relating to common carriers, with some slight assistance from statutory enactments, to the rights and duties of railroad companies.

If it be asked, then, what principle is it that imposes upon a railroad company the duty of preserving good order on its trains, and makes it liable for all injuries sustained by reason of a failure to discharge this duty, we answer, that it springs out of the obligation resting upon it to use every power with which it is invested to transport the passenger safely to his destination.

We freely grant that it is not an insurer of the passenger in the same sense as it is of freight committed to it for shipment. It is not responsible to him for any casualties, except such as occur through its improper equipments, or the negligence or wilful wrong-doing of its agents; but the omission of these agents to exercise any power which the law has intrusted to them for the benefit and protection of the traveller is negligence as clear and unmistakable as a failure to put out a signal-light or sound a whistle.

The right, and consequently the duty, of the officers in charge of a railroad train to preserve order thereon, and, if necessary, to eject therefrom all drunken, riotous and disorderly persons, as well as all persons violating the reasonable rules and regulations of the company, has been declared and vindicated in countless cases, both in this country and in England. Indeed, we are not aware that it has ever been seriously questioned by any respectable court. It was said by the Supreme Court of Massachusetts, in a well-considered case, that a conductor may expel from the train a person who, by reason of intoxication or otherwise, is in such a condition as to render it reasonably certain that by act or speech he will become offensive or annoying to other passengers, although he has not actually committed any act of offence or annoyance. *Vinton* v. *Middlesex Railroad*, 11 Allen, 304.

Now, for what purpose is this power intrusted by law to the officers in charge of a train? Partly, doubtless, for their own personal protection in the discharge of their duties. Partly, also, for the protection of the property and interests of the company, but surely not less for the protection, likewise, of the passengers who for the time being are under their

care, and to some extent in their custody. If a railroad conductor in charge of a train is assaulted by a personal enemy on some private grievance, he may, of course, defend himself, like any other man. But he may do more. He may stop the train, call to his assistance all his fellow-employés and the willing passengers, and eject his antagonist from the train; and this, too, without regard to the merits of the private quarrel between himself and his enemy. Why is this? Because, apart from his rights as a man, he may defend his official position for the benefit of the company and of the passengers intrusted to his care. So, likewise, if he sees one passenger making upon another an assault, unprovoked at the time, he may command the peace, and, without regard to the merits of the quarrel, compel it, if necessary, by an ejection of the unruly party. In so doing he decides nothing as to the merits of the quarrel and will no more be liable for an honest and impartial mistake than a police-officer would be under similar circumstances. He merely says, in effect, " You shall not fight nor quarrel on this train. By virtue of my position, and by the duty that I owe to the other passengers, I command the peace, and, if necessary, I will summon the power of my train to enforce it." Can there be any doubt of his authority to do this? Are not the cases numerous where men have been put off trains for being drunk or noisy, or blasphemous in the presence of lady passengers; and has not the action of conductors in so doing been uniformly sustained by the courts? But if he may do this voluntarily at his option, is he not compelled to do it when requested by those for whose benefit the power has been conferred upon him?

Powers and duties are usually reciprocal, and may be said to be uniformly so when the power is of a public, official character, conferred for the benefit of others. The failure or refusal of the official to exercise such a power in a proper case, when called upon by those for whose protection he has been invested with it, amounts to negligence, or to wilful misconduct, as the circumstances of the case may indicate.

If two or three burly blackguards, boarding the train of the defendant railroad, at the Louisiana line, should ride through the State, insulting and beating every man, woman and child who entered the cars, can there be any doubt of the

authority or duty of the officers in charge to use their utmost power to prevent the outrage ? Can they, disregarding the cries of the passengers for help, proceed quietly with their accustomed duties, and to every appeal respond, " It is none of our business. You must help yourselves " ? Surely, to ask these questions is to answer them.

We conclude, then, that the undoubted power which is vested in railroad officials to preserve peace and good order on their trains, and, if necessary for this purpose, to eject therefrom turbulent and disorderly persons, carries with it the absolute duty to exercise the power, when called upon so to do in a proper case by the other passengers; that a failure to discharge this duty stands, to some extent, upon the same footing as the omission to perform any other official duty, and, upon the maxim *respondeat superior*, renders the corporation liable.

The announcement of this doctrine for the first time, in its practical application in the jurisprudence of the State, admonishes us that it should be stated with its proper limitations and restrictions.

It is first to be observed that the liability of the carrier arises, not from the fact that the passenger has been injured, but from the failure of the officials to afford protection. It will be necessary, therefore, in each case to bring home to the conductor knowledge or opportunity to know that the injury was threatened, and to show that by his prompt intervention he could have prevented or mitigated it. It must be remembered, also, that the power at his disposal consists of the train hands and the willing passengers ; that he can never be expected to accomplish any thing more than is possible with this force ; and that all that can be required of him, at last, is a fair and honest effort to prevent the wrong.

Considering the delicate, and often difficult and dangerous, duties that may devolve upon him, he should be allowed a wide latitude in the means to be employed ; and his superiors should never be mulcted in heavy damages where there has been a *bona fide*, though mistaken, attempt to afford protection. We would say that, ordinarily, what is termed punitory or exemplary damages should not be awarded, unless there has

been a wilful refusal or absolute failure to interfere when called upon, or when the injury occurs in the presence of the officer who could have prevented it.

To illustrate these principles, we think, in the case at bar, that though the conductor in this case was quite dilatory in going to investigate the matter and to obtain the plaintiff's hat, yet that as the plaintiff seems to have acceded, or at least not to have objected, to the delay, it afforded no ground of complaint. When the parties went together into the baggage car, we think that the conduct of the conductor was weak and inefficient, but not perhaps of itself sufficient to call for the infliction of *punitory* damages. When the fight commenced, he precipitately abandoned the plaintiff, as testified by the latter; but this, if true, was evidently the effect of fear rather than of an indisposition to do his duty; and it must be remembered that it is no light thing for an unarmed man to rush between fighting men, armed with deadly weapons and inflamed with liquor and passion. Weak and inefficient action might well render the company liable for compensatory damages; but to warrant the infliction of punitory damages, there must, where the carrier is held liable for the acts of passengers, be a wilful failure or refusal to act, or such conduct as indicates sympathy with the aggressors, rather than with the aggrieved. It was the subsequent conduct of the officer in making no attempt to check the rioters, in leaving them masters of the car and of the plaintiff's luggage, in hurrying the plaintiff off to a remote part of the train and allowing his assailants to continue their cursing and denunciation of him in the adjoining car, which constitutes the worst feature of the transaction, and which, coupled with the retention by the company of the men in their employ, seems fairly to have warranted the jury in the infliction of punitory damages.

These circumstances indicate, if not sympathy with the aggressors, such gross shrinking from duty on the part of the conductor, and such want of appreciation of the outrage on the part of the corporation, as fully to justify the verdict.

Very grave errors were committed by the court in the giving of the instructions.

The plaintiff's instructions were loosely drawn, and scarcely

any of them announced with proper limitations the law of the case. This is especially true of the third and seventh instructions, which first lay down an incorrect basis for awarding punitory damages, and then inform the jury that it is their duty to inflict them. This is, of course, erroneous, since the imposition of such damages is always discretionary with the jury.

It is earnestly insisted that the verdict should be set aside on account of these wrongful instructions. It is, of course, to be desired that juries should always be properly instructed, especially as to matters which, like the infliction of damages, are so wholly within their control, that the courts will rarely interfere. If the facts left it doubtful whether their imposition was justifiable in this case or if the amount could be said to be excessive, the erroneous instructions might prompt us to reverse the judgment.

But, as we have seen, the circumstances warranted the imposition of such damages, and though the sum is considerable, we cannot say, in view of the standing, character and conduct of the parties, that it is excessive. Why should a verdict be set aside which is correct, because erroneous principles of law have been announced by the court? The object of a jury trial being to do justice between the parties, the annulment of the verdict, where this has been accomplished, on account of mistakes and misdirections on the part of the court, would seem akin to the criticism which censured a celebrated commander because he persisted in winning victories in violation of the rules of strategy.

While it was improper for the court to instruct the jury that it was their duty to inflict punitory damages, yet where the facts fully warranted their imposition, the verdict must be referred to the facts which made it right, rather than to the instructions which would make it wrong.

*Let the judgment be affirmed.*

Motion in arrest of judgment. The sureties on the *supersedeas* bond in this case, by their counsel, filed a motion in arrest of judgment, on the ground that the instrument in the record, purporting to be a *supersedeas* bond, was not one

upon which the statutory judgment of affirmance could be based, because said instrument was not under seal, as required by the statute.

*Harris & George*, for the motion.

The instrument certified to this court as a *supersedeas* bond is not valid as such. It is not the instrument required by the statute to be executed. The statute requires an obligation or writing obligatory. It uses the terms " bond " and " obligors," both terms having a known definite meaning, that is to say, a writing under seal.

The instrument certified is the writing obligatory of two persons, to wit, the plaintiff in error, and one surety, to wit, the Mississippi Valley Company. It is not the writing obligatory of Williams, who signed the instrument, omitting his seal.

A bond with one surety is not a valid *supersedeas* bond.

The rule in regard to statutory bonds is, that, if they do not comply with the statute, the statute does not take effect on them as to the remedy for enforcing them which it prescribes. The instrument being voluntary, if it otherwise possesses the qualities of a valid contract, it may constitute a legal liability ; but it is void as a *statutory* bond.

No judgment will be rendered, or should be rendered, on an invalid *supersedeas* bond. *Brown* v. *Levins*, 6 Porter, 414; *Curry* v. *Barclay*, 3 Ala. 484.

On the subject of judgments on statutory bonds by operation of law, or on specific remedies, see *Baskin* v. *May*, 9 S. & M. 373 ; *McComb* v. *Ellett*, 8 S. & M. 505 ; *United States* v. *Linn*, 15 Pet. 290.

The doctrine of estoppel does not apply in such case, because the defect is patent, and the plaintiff below must be held to take cognizance of the defect. A failure to comply with the law left the plaintiff free to execute the judgment. If the clerk illegally issued the writ of *supersedeas*, the plaintiff had ample opportunity to have it discharged. Indeed, the issuance of the writ was an illegal act, and it might have been treated as a nullity. In this view of the subject, the suspension of execution was voluntary.

If a party should file a forged bond and get a *supersedeas* by it, he would be estopped to set up the forgery ; but, cer-

tainly, if he filed a promissory note of himself and two others, and the clerk should issue a *supersedeas* on it, he could have misled no one, and he, and certainly his co-promisors, would not be estopped to assert that they were not subject to the statutory judgment.

It cannot be said that Williams has adopted the seals of the two corporations. There is certainly no occasion to indulge the supposition that Williams intended to adopt the corporate seals of the two corporations. The presumption is that he did not.

The seal or scroll may be considered as a worn-out ceremony; but the seal originally was of no earthly significance, unless it identified the individual sealing the instrument. It is individualized, as is the signature. 7 Humph. 222; 10 Barb. 388.

If the bond or writing under seal was not actually executed, we cannot here execute it, by construction of law.

*A. H. Handy*, for the defendant in error, cited, *contra*, *Yarborough* v. *Monday*, 2 Dev. Law, 493; 2 Phill. Evid. 497, and cases cited; Com. Dig. title *Fait*, A. 2; 2 Johns. 285; Mathews on Presumptive Evidence, 39, Rand's ed.; Hurlstone on Bonds, 7 (7 Law Library); 2 S. & R. 504; 2 Phill. Evid. 475, note; 1 Sugden on Powers, 300, 301; 2 Phill. Evid. 456; Code, § 2227; 2 East, 417; 2 Smith's Leading Cases, 743, 744; 28 Conn. 527; *Baskin* v. *May*, 9 S. & M. 373.

Chalmers, J., delivered the opinion of the court.

Judgment of affirmance having been pronounced herein, a motion in arrest thereof is submitted upon the part of the sureties in the *supersedeas* bond, on the ground that that instrument does not conform to the requirements of the statute, and cannot therefore be made the basis of the usual judgment of affirmance. The body of the instrument is in the usual form, and is signed by the judgment debtor and two sureties, as required by law. Opposite the names of the principal and of one of the sureties there are seals affixed, but there is none affixed to the name of the second surety, who is the third and last signer.

Inasmuch as the statute (Rev. Code, § 410) requires

*supersedeas* bonds upon appeals to this court to have two sureties, it is said that the instrument purporting to be such in this case is the bond or sealed obligation of one surety only, and that however valid it may be as a common-law obligation, it will not authorize the rendition of a judgment against the sureties by this court.

In support of this proposition we are referred to the cases of *Baskin* v. *May*, 9 S. & M. 373; *Brown* v. *Levins*, 6 Porter, 414. It is to be observed that in both of these cases the objections to the bonds were urged by the appellees, who desired to have the appeals dismissed or the *supersedeas* discharged. Whether such objection would be heard after the entry of a judgment of affirmance from those who had brought the case to the appellate court, and thereby obtained the full benefit of the defective instrument as a valid one, may be considered more questionable, though it seems to have been so held in *Curry* v. *Barclay*, 3 Ala. 484.

Conceding, without deciding, the point, we will consider whether there are sufficient circumstances apparent upon the record to warrant us in holding that the party who failed to affix a seal to his name adopted those affixed by the others.

It has been held from the earliest times that it was not essential that all the obligors in a joint deed or bond should affix their seals, but that where one had sealed, the others might adopt the seal affixed by him. Thus it was said in an early case that "if one of the officers of the forest put one seal to the rolls, by assent of all the verderers, regarders, and other officers, it is as good as if every one had put his several seal, as in case divers men enter into an obligation, and they all consent and set but one seal to it, it is a good obligation of them all." *Lord Lovelace's Case*, Sir Wm. Jones, 268; Com. Dig. title *Fait*, A. 2; 2 Phill. Evid. (4th Am. ed.) 457, and cases cited.

This adoption by one of the seal of another, or by several of the seal of one, was anciently evidenced by the imprinting of the several seals or marks upon a common wax or wafer; but the substitution of scrolls for wax in modern times has not rendered the doctrine obsolete; and though there no longer remains ocular evidence of the adoption, and the proof of it is

thereby rendered more difficult, it is still no less true that scrolls need not be affixed by all, but that several may adopt one scroll.

The undoubted tendency of the cases has been, as far as possible, to do away with the idle ceremony of affixing seals; which, however important and essential before the general diffusion of education, seems long since to have lost its value, and is probably retained, partly from the fear that its abolition may produce unforeseen legal difficulties and complications, and partly from that strong feeling of conservatism which we have inherited from our English forefathers, and which is, perhaps, nowhere so potent as in the legal profession.

Whether, where one seal is affixed, the recitals in the instrument itself, that it is the bond of all, are sufficient to show that this seal has been adopted by all the signers, has been much discussed; but the authorities are by no means uniform. Such recitals have been held insufficient in Maryland and Pennsylvania. *Stabler* v. *Cowman*, 7 Gill & Johns. 284; *Taylor* v. *Glaser*, 2 S. & R. 502. They were also held insufficient, but by a divided court, in North Carolina (Chief Justice Henderson dissenting). *Yarborough* v. *Monday*, 2 Dev. 493. In Tennessee, it was said that the recitals would be sufficient on demurrer. *Hollis* v. *Pond*, 7 Humph. 222. They were held sufficient of themselves to show adoption in Maine and Kentucky. *Bank of Cumberland* v. *Bugbee*, 19 Me. 27; *Bohannons* v. *Lewis*, 3 Monroe, 376. In New York, it was held by Chancellor Kent, that, though one partner had no right by instrument under seal to bind his copartner, yet if the latter knew of it, and acted upon it, he would be held to have adopted the seal affixed. *Mackay* v. *Bloodgood*, 9 Johns. 285. In Pennsylvania, it was held that, in such a case, the fact that the partner who had not sealed, referred, in a subsequent instrument, to the disputed document, and received the benefit of it in a business negotiation, was a strong circumstance to show an adoption by him of the seal affixed by his copartner. *Fichthorn* v. *Boyer*, 5 Watts, 159.

While these authorities leave it doubtful whether the recitals of the instrument alone may be taken as affording sufficient evidence that the party who has not affixed a seal adopted

the seal of those who did, they clearly indicate that such adoption may be inferred from his acts, without proof of any formal declaration by him to that effect at the time of signing.

In the case at bar, the surety, who failed to affix a seal or scroll to his name appeared before a magistrate and subscribed and swore to an affidavit, setting forth that he was worth the penalty of the bond. In this affidavit, which must be held to have been written by him, or, at least, to have been read and adopted by him, the paper is twice styled a bond, and he is styled a surety on it. It was argued that this was the language of the magistrate, and not of the party. We do not so understand it. Certificates speak the language of the officers making them, but affidavits that of the affiants.

The paper, with the affidavit annexed, was then filed with the clerk of the Circuit Court, a *supersedeas* was issued, and the case brought to this court. It was here treated by the parties and the court as a *supersedeas* bond, until after judgment of affirmance pronounced, when, for the first time, its validity as such was challenged by this motion.

Whenever, upon the rendition of a judgment against the principal in a bond, judgment goes also by operation of law against the surety, the latter must be held to be always in court to the same extent that his principal is, equally with him a party to the suit, with the same knowledge of the proceedings therein, as we had occasion to declare in the recent case of *Jones* v. *Coker, ante,* 195. It follows, therefore, that, since the execution of the appeal bond in this case, the sureties have been constantly asserting that it was their bond : first, before the magistrate who took their affidavit of solvency; then, before the clerk who issued the *supersedeas ;* and, finally, before this court. We will not say that they would be thereby estopped from denying that such was its character, if, in fact, it was wholly unsealed ; but, inasmuch as two seals appear upon it, we think that these circumstances may be fairly held to indicate an adoption of those seals by the third signer.

*The motion in arrest of judgment is overruled.*

Campbell, J., having been of counsel, takes no part in either of the decisions in this case.