ELSIE L. BRITTON v. ATLANTA & CHARLOTTE AIR–LINE RAILWAY COMPANY.

*Railroads, duty of company to protect passengers.*

1. A railroad company has a right, and it is its duty, to establish and enforce reasonable rules and regulations for the government and direction of trains; and of such, the passenger must inform himself and conform thereto.

2. The company cannot relieve itself of responsibility for injuries received by a passenger, where it is shown that such rules were not enforced, but their observance left discretionary with the passenger.

3. The right of a railroad company to assign white and colored passengers to separate, though not unequal accommodations, is recognized by the courts.

4. The company owes to every passenger the duty of protecting him from the violence and assaults of his fellow-passengers or intruders, and will be held responsible for its own or its servants' neglect in the premises, when the same might have been foreseen and prevented by the exercise of proper care. The plaintiff in this case was entitled to have the jury instructed that taking the evidence to be true, the company is liable in damages for the injuries sustained.

CIVIL ACTION tried at January Special Term, 1882, of MECK-LENBURG Superior Court, before *Bennett, J.*

The plaintiff in this action is a colored woman, and seeks to recover of the defendant company damages for injuries sustained by her, while travelling on its train. The train was a special one for excursionists, running from Atlanta, Georgia, to Charlotte, North Carolina, on the 23d day of July, 1878. Hand-

bills had been posted, advertising the time and terms of the excursion, and that separate cars would be provided for white and colored passengers.

The injuries complained of consisted in her being assaulted by a stranger, and forcibly ejected from the car in which she had been seated—it being the "smoking car," which had been provided for the white male passengers.

The case for the plaintiff is as follows: Having purchased a ticket at Greenville, South Carolina, she, in company with a man and woman belonging to her race, entered the defendant's train and occupied seats in the car in question. No one pointed out to them the cars intended to be occupied by the colored passengers, nor did she know that separate cars had been provided for the two races, or of the regulation of the company requiring it to be done. Before the train left Greenville, some one, a white person, not in authority, began to cast reflections upon the party, saying that "d—d niggers had no business in there," and when under way, others of the white passengers cursed them for being in the car, and declared that they didn't want "niggers" in that car; and for the purpose of annoying them sang vulgar songs and whooped and hallooed at the top of their voices. The man who accompanied the plaintiff, and whose name was Culp, spoke to the conductor in charge of the train about the conduct of the other passengers, and complained of it.

The conductor accepted the tickets of the three, and told them they might sit in that car, but as it was an excursion train he could not control the conduct of the other passengers, and they might expect rudeness. Whenever the conductor was present, the misbehavior would cease, but as soon as he left the car it was resumed. He was appealed to as many as four times to protect them from insult, but each time said he could not help it. While the train was stopped at King's Mountain station, a white man, whom none of the party knew, ordered them out of the car, when Culp asked to see the conductor. The man went out, soon others came in and said to Culp, "get up and go out of

here." He again asked to see the conductor and retained his seat, whereupon he was seized, beaten, and finally ejected from the car. The same persons then seized hold of the plaintiff, beat and badly bruised her, and finally put her and her companion out of the car, and threw their baggage upon the platform.

The plaintiff then went into another coach, which was filled with colored people, every seat being occupied, so that she had to stand for some time after the starting of the train, when some one got up and gave her a seat.

During the time the plaintiff and her companions were being ejected, neither the conductor nor any other employee of the defendant was present to protect them; nor did she see the conductor until after the train was in motion, when he came to where she was standing, and, when informed of what had taken place, said that he knew nothing about it; and that none of the other passengers knew anything about it. He gave her no seat, but went out, leaving her standing, and it was only through the kindness of another passenger that she got one at all, and then it was by an open window, and being at night, she took violent cold.

The case shown by the defendant is as follows: The excursion had been extensively advertised by large handbills, in which it was announced that separate coaches would be provided for white and colored passengers. The train at Greenville was composed of six coaches, all substantially alike as to their conveniences and accommodations—the two next to the baggage car being reserved for colored passengers, the third as a smoking car for whites, and the others for whites generally. There was no notice on either the outside or inside of the coaches to indicate which were intended for whites, or which for colored people, though at Greenville there was an announcement made to that effect by one of the brakemen in defendant's service. After leaving that station, the conductor, in passing through the train, found the plaintiff and her party in the smoking car, and called

for and accepted their tickets. He then said to them that the two forward coaches were intended for persons of their color, to which they replied that they were pleasantly situated, and preferred to remain where they were.

The instructions given by the company to the conductor were to advise such colored passengers as he might find in the coaches set apart for whites to go to the others, but if they declined to do so, to allow them to remain where they were, so long as they conducted themselves properly.

At some point before reaching King's Mountain, the colored man, Culp, in the presence of the plaintiff, complained to the conductor of the rudeness of some of the white passengers towards himself and his companions, and of the indecent language used in their hearing, when he was again told that he would find a pleasanter seat if he would go into the forward coaches, in which, at that time, there was a number of vacant seats.

The white persons in the coach, who were known to the conductor to be "wild young men from Atlanta, on a spree," also complained of the presence of these colored persons in the coach, and inquired of that officer if he did not mean to put them off?

At another time, the party complained to the conductor of being cursed and insulted by the others, when he said to them, that while he would not require them to go into the other car, he would still advise them as a friend to do so, and expressed some surprise at their unwillingness to do so, whereupon Culp said he desired to go, but that the females under his charge were unwilling.

The behavior of the plaintiff and her companions while in the car was entirely becoming, and their dress and appearance decent.

The train stopped at King's Mountain at eight o'clock P. M., and while there, one Ramseur, who was neither a passenger nor employee on the train, entered the smoking car, for the purpose of seating some white women who came in with him. The seats being filled, and seeing the two colored women there, he asked

for their seats, which they declined to surrender.  Some one in
the crowd proposed to put them out, to which Ramseur assented
and seized hold of the plaintiff.  Thereupon Culp cried out,
"don't strike that lady," when Ramseur struck him over the
head with a stick, and then, with the help of some of the white
passengers, ejected all three from the car.

At the time of this occurrence, the conductor was in the bag-
gage car, with the baggage-master, receiving and delivering
baggage; and the other train hands, of whom there were three,
had been sent for water to refill the coolers in the coaches.  While
there, the conductor was told that a row was about to take place
in the smoking car, and that his presence was needed, to which
he replied that he would go as soon as he could start the train.
In a minute or so he rang his bell, and as soon as the train
moved, he started to the scene of disturbance, but when he
reached the second coach from the baggage car, he there found
the plaintiff and her friends.  She was standing up and made
serious complaints of his not having been present to protect her.
He told her that she should have a seat; but by this time every
seat was occupied, so that he was unable to provide her with one,
and consequently had to leave her standing.

Amongst others the following instructions were asked :

1. That upon the evidence, taken as a whole, the plaintiff was
entitled to recover of the defendant compensation to the extent
of her injuries.

2. That being permitted by the conductor to remain in the
coach, she was rightfully there, and was under no obligation to
give up her seat to another, when ordered to do so, either by a
fellow-passenger or an intruder into the train.

3. That being rightfully there, it was the duty of the servants
of the defendant to protect her, and to see that she was neither
insulted nor injured by her fellow-passengers, and for their fail-
ure in this regard the company is liable.

The instructions given were substantially as follows:   The
defendant, as a common carrier of passengers, had the right in

making up its train, to provide and set apart certain coaches for the exclusive accommodation of persons of each race; there is no law which prohibits their doing so, provided they observe substantial equality in the accommodations provided for both. If, on the occasion of this excursion, the defendant had made such provision for separate coaches for the two races, it was its duty to give notice of that fact to the passengers, and especially the colored ones. If the plaintiff, being a colored person, entered the coach in question set apart for whites, and while there demeaned herself decently and becomingly, no one but the conductor, or some one acting by his authority, had the right to remove her from the coach or to require her to change her seat; and if no such instructions had been given by the conductor, then, when at King's Mountain, she was rightfully occupying the seat. It is the duty of common carriers of passengers to use the utmost care and diligence, consistent with human foresight, to convey their passengers safely, though they are not insurers of their safety. It is equally the duty of carriers to use the same care in protecting passengers against violence and injury at the hands of their servants, and likewise to come to their protection, when they are the object of attack or violence at the hands of their fellow-passengers; and for a failure in the scrupulous discharge of duty in any of the particulars enumerated, they are liable in damages to any passenger whom they may fail to protect.

In conclusion, the jury were told that if satisfied the plaintiff was injured or wronged in the manner complained of, and that such injury or wrong resulted directly from the acts of defendant's servants, or from their failure to exercise that scrupulous degree of care which had been explained to them, then she was entitled to recover of the defendant for the injuries sustained.

The verdict of the jury was for the defendant upon all the issues, and after judgment thereon the plaintiff appealed.

*Messrs. T. M. Pittman* and *N. Dumont,* for plaintiff.
*Messrs. Jones & Johnston* and *D. Schenck,* for defendant.

RUFFIN, J.   The court has found no difficulty in concurring in many, if not all, of the propositions propounded in the charge of His Honor to the jury, or in the positions assumed by counsel at this bar.   No sort of doubt is entertained as to the right, and, in some cases, the duty, of carriers, who undertake to convey passengers for hire, to establish and enforce reasonable rules and regulations for the government and direction of their trains, or as to the duty resting upon the passengers, when uninformed in regard to them, to inquire into and learn their established regulations, and when instructed, to make their actions and movements conform thereto.

Equally well settled does it seem to be, both upon principle and authority, that amongst those reasonable regulations which they have a right to adopt, is the one of classifying their passengers and assigning them to separate, though not unequal accommodations.

This right, as regards the separation of the white and colored races in public places, has been expressly and fully recognized in many of the courts, both state and national.   *Westchester R. R. Co.* v. *Miles,* 55 Penn. St. Rep., 205 ; *Day* v. *Owen,* 5 Mich., 520 ; *Hall* v. *DeCuir,* 95 U. S. Rep., 485.

In some of the cases, it is said to be not barely a right appertaining to the carrier, but a positive duty, whenever its exercise may be necessary in order to prevent contacts and collisions arising from natural or well known antipathies, such as are likely to lead to disturbances from promiscuous intermingling.   If this be so, then in no case does it seem possible that it could so certainly attain to that standard, and become imperative upon the carrier, as on the occasion of an irregular excursion party, composed mainly of irresponsible and excitable individuals.

Satisfied, however, as the court may be of the correctness of the principles asserted, it is still at a loss to perceive what con-

nection they have with the case in hand, or how in any way it could be made to be dependent upon them, since the evidence wholly fails to show that the defendant had, on this occasion, established any fixed or certain rule in reference to the matter. It is true, that the handbills, by which the time and the terms of the excursion were published, announced that there would be "separate cars for white and colored," but whether this was one of the acts of the advertiser, resorted to in order to render the excursion popular with the better paying class of citizens, or whether it was intended to be a regulation for the government of the conduct of all parties, is left altogether uncertain. In the absence of all other proof upon the point, the court might and probably would put the latter construction upon it; but it is impossible to do so when the defendant shows, out of the mouth of its own witness and officer, that the real instruction given to the conductor of the train was, not to enforce it as a law of the company's making, but simply to give advice upon the subject, and then leave it to each individual to determine his or her own course.

The rules and regulation which the carrier has the right to adopt, in matters of this sort, must be such as are reasonable in their nature, and in their demands upon the passenger; and to be this, they must have for their first and main object the safety and convenience of the passenger, and must be uniform, positive, and obligatory alike upon all parties. The carrier is presumed fully to understand the exigencies of such occasions, and how to meet them; and it is for him to decide and see that others obey; nor will the law permit him, by any equivocal or uncertain course of conduct—such as barely giving advice—to shift the responsibility from his own shoulders to those of the passenger.

When the plaintiff and her friends took seats in the coach in question, they did so in the exercise of a right and a discretion expressly left to them by the defendant's own regulation, and were therefore clothed with every privilege that appertained to any other passenger in the coach, and were entitled as fully as

any other to be protected from injuries arising, as well as from the neglect of the company's servants as from the unprovoked assaults of their fellow-passengers; and more especially was this so, after the conductor had been appealed to, and assured them of their right to the seats, even though he did offer the advice which he had been instructed to give them. So that, the right of the plaintiff to recover in this action depends, as we conceive, upon no question connected with her color or with her presence in any particular coach in the defendant's train, but upon the general law regulating the duties and responsibility of the carriers of passengers in all such cases.

While in this state there seems to be no express authority as to the duty of the carrier to afford protection to the passengers against the assaults of his fellow-passengers or strangers, we still have the decisions of other courts in regard to it, which, although comparatively recent, strenuously commend themselves to our consideration, as well by their right reasoning and plain sense of justice as by the high character of the tribunals from which they emanate.

According to the uniform tendency of these adjudications which we admit as authorities, the carrier owes to the passenger the duty of protecting him from the violence and assaults of his fellow-passengers or intruders, and will be held responsible for his own or his servant's neglect in this particular, when, by the exercise of proper care, the acts of violence might have been foreseen and prevented; and while not required to furnish a police force sufficient to overcome all force, when unexpectedly and suddenly offered, it is his duty to provide ready help sufficient to protect the passenger against assaults from every quarter which might reasonably be expected to occur under the circumstances of the case and the condition of the parties. *New Orleans R. R. Co.* v. *Burke,* 53 Miss., 200; *Pittsburg R. R. Co.* v. *Hinds,* 53 Pa. St. Rep., 512; *Pittsburg R. R. Co.* v. *Pillow,* 76 Pa. St. Rep., 510; *Flint* v. *Norwich Transportation Co.,* 34 Conn., 554; Thompson on Carrier, 303.

Tested by this rule, and conceding that the facts of the case were as insisted upon by the defendant, and as proved to be by its own witnesses, the conduct of the defendant's servants, and especially of its condutor, was grossly and unpardonably negligent. He had knowledge of the reckless character of those who occupied the coach with the plaintiff; and while he may not have had positive premonition of threats towards her, he was fully aware of the dissatisfaction to which her presence there, with her companions, had given rise, and of the desire for their expulsion, which had been openly expressed, as well as of the fact that ribald songs and coarse and insulting language had been indulged in for the very purpose of vexing them and rendering their situation intolerable.

Circumstances such as these ought to have aroused, if they did not, the apprehensions of the officer for the safety of the plaintiff, and called for his constant and watchful interposition in her behalf, in order to protect her from insult and injury. His duty at that time was made so plain that the law itself will pronounce upon his conduct, and declare to be inexcusable his negligence in sending off upon other missions every other employee of the company, and betaking himself to the baggage car during the entire stay of the train at that depot. His dalliance, too, in going to her relief when informed of the imminency of the outrage upon her rights, manifested such an indifference on his part as was inconsistent with her claims and his duty. The duty which he owed to the defendant, of looking after the baggage of the passengers and putting the train in motion, was altogether secondary to that which, under the circumstances, he owed to the plaintiff, and should have been promptly subordinated thereto; and his failure to do this was another instance of negligence on his part, which brings responsibility upon the employer.

But above all this, the plaintiff had, as we have seen, acquired an established right to the seat which she occupied upon entering the defendant's train. She held it by the same tenure that

69

every other passenger upon the train held his seat, and no one had the right either to call upon her to surrender it or to eject her from it by force; and upon being notified that her ejection had taken place, the first duty of the officer was to see her restored to it; and not until this was done, if demanded by her, was his whole duty, or that of the defendant, to the plaintiff, fully discharged.

The liability of the defendant to the plaintiff grows not out of the fact that she was injured, but out of the failure of its servants to afford her protection, after they had reasonable grounds for believing that violence to her was imminent, and also out of their omission to see her righted after the commission of the assault upon her, and her forcible ejection from her seat. The failure of its servants to discharge these duties to the plaintiff stands exactly upon the same footing as would their failure to discharge any other duty which the defendant, as a carrier, owed to her; and upon the maxim *respondeat superior*, their negligence rendered it liable.

Whether there is negligence, when the facts are admitted, or proved, becomes a question of law for the court to determine, and, therefore, this court thinks the plaintiff was entitled to the instruction asked, that, taking the whole evidence to be true, she was entitled to recover of the defendant compensation for her injuries, sustained by reason of the negligence of its servants. Because of the omission on the part of the judge below to give such instructions to the jury, she is entitled to a *venire de novo*.

Error.　　　　　　　　　　　　　　　*Venire de novo.*