KING and others *v.* OHIO & M. RY. Co. and others.

*(Circuit Court, D. Indiana.* December 4, 1884.)

1. CARRIER OF PASSENGERS—OBLIGATIONS OF—INJURY BY FELLOW-PASSENGER.
   A common carrier of passengers for hire is bound to see that no harm comes to a passenger from a fellow-passenger, whose conduct and condition clearly show that he is a dangerous person and likely to injure his fellow-passengers.

2. SAME—DUTY OF EMPLOYES.
   Where the conduct of a passenger is such as to clearly show that he is dangerous, it becomes the duty of the employes of the company in charge of the train to keep him in close custody and disarm him, or remove him from the train.

3. SAME—CHANGE OF EMPLOYES.

In cases of change of men in charge of passenger trains, the new men should be informed of everything known to those retiring which ought reasonably to be deemed important to a proper discharge of the carrier's duty.

Chancery. Intervening petition of Matilda Wingate, administratrix. *Percy Werner* and *Harrison, Miller & Elam,* for receiver.

*John M. Lausden* and *Angus Leek,* for petitioner.

WOODS, J. The claim in this case is for damages on account of the death of Alexander Wingate, who, on the twenty-eighth day of March, 1882, while a passenger in the cars of the defendant, going from St. Louis to Louisville, was shot and killed by one Haynes, a fellow-passenger. Some time after the departure of the train from St. Louis, Haynes, who had been drinking freely, was transferred from a sleeping-car by the conductor and porter of that car to the coach at the rear of the train, in which Wingate was riding, and in which Haynes had been before going into the sleeper. The reasons for this transfer are not explicitly disclosed by any witness, but it is not an unfair inference that Haynes had given such proofs of drunkenness and disorderly conduct as made his removal from the sleeper proper, if not, indeed, necessary. He continued disorderly and troublesome until near Vincennes, when, according to the language of the brakeman, he quieted down. At Vincennes there was a change of conductors and brakeman, and notice given to the new brakeman by the retiring one "that there was a drunk man on the train who had given some trouble, but had quieted down." No other or more specific notice than this of Haynes' conduct between St. Louis and Vincennes was given to those who were to have and did have charge of the train upon the run from Vincennes eastward. In respect to the conduct of Haynes from the time of leaving Vincennes until the train had approached North Vernon, Indiana, when he shot Wingate, and himself jumped from the train and was killed by the fall, or drowned, there is conflict between the testimony of passengers and of the conductor and brakeman. The master has given credence to the testimony of the passengers, and, after rehearsing the evidence in some detail, concludes his report as follows:

"The rule of law upon which the claim for recovery is based in this case is comparatively new. It is this: that a common carrier of passengers for hire is bound to see to it that no harm comes to a passenger from a fellow-passenger, whose conduct and condition clearly show that he is a dangerous person, and is likely to injure his fellow-passengers. There is no doubt in this case that Haynes, who killed Wingate, was, at the time he fired the fatal shot, suffering from a fit of *delirium tremens.* If the employes of the receiver knew this, or should have known it from what they observed in Haynes' conduct prior to the shooting, and knew he had a revolver in his possession, the receiver, in the master's opinion, is liable.

"The master is also of the opinion that the receiver should be charged with notice of the facts that came to the knowledge of his employes, whether upon the east or west division of the road. There is a serious conflict in the evidence as to the extent of the knowledge by the employes of Haynes' condition,

although upon the statements of Burke and Fessenden, the brakeman and conductor west of Vincennes, and the statements of Newton, Kenner, and Smith, the conductor, brakeman, and porter who were on the division east of Vincennes, it is apparent that the employes knew enough to require them, as prudent men, either to take charge of Haynes and guard him securely, or to have him put off from the train, to prevent his injuring passengers. They knew that he had been drinking between St. Louis and Vincennes. They knew that he had been ejected from the sleeping-car for misbehavior, or on account of his drunken condition. They knew that he was frightened, and had the delusion that somebody on the train was seeking to knock him down and rob him of his money. They knew that he had been trying to give his money away to some of the passengers on the train, and that he had asked the conductor to take charge of it for him. They knew that in going about the car he staggered or crawled over the tops of the seats from one place to another. They knew that by his misconduct he had compelled Mr. Collins and his wife and daughter to leave the seats they had been occupying and seek others, to avoid him. They knew that he was afraid to be left alone in the car when the conductor got out at Mitchell to go to the front of the train, and asked to be let go with him, and was pacified by the promise of the conductor that the brakeman would remain with him, the conductor promising to return in a few minutes. They knew that he had a revolver in his possession.

"Mr. Newton, the conductor on the east division, recommended him to take a drink of liquor, seeing his nervous and excited condition. This he certainly would not have done if he thought the man was getting drunk; it was because of his nervous and excited condition, which indicated clearly to his mind that the man was suffering from or on the verge of *delirium tremens*. The conductor and brakeman both speak of the weak, tremulous voice, indicating that he was in a state of childish fear of harm from some one. Coming to the testimony of the passengers, the master cannot disbelieve the statements of Mr. and Mrs. Ousley, and Mr. and Miss Collins, that Haynes repeatedly exhibited and flourished his revolver in the car, in the presence of the brakeman, although the brakeman denies that he saw the revolver at any other time than when the conductor took up Haynes' ticket, some miles east of Vincennes. Mr. and Mrs. Ousley also swear that before the shooting Mr. Ousley warned the conductor, or the brakeman, that Haynes was dangerous, and that unless put off the train or disarmed would kill or injure some one with his pistol. The conductor insists that no remark of that kind was made in his hearing until after the shooting, but the preponderance of the evidence is the other way.

"Upon the whole case, the evidence shows, in the opinion of the master, that the passenger Haynes was not only dangerous, but that his conduct was such as to clearly indicate it in such a way that it became the duty of the employes of the receiver, in charge of the train, to keep him in close custody, and disarm him, or remove him from the train at the first station after they learned of his dangerous condition."

Damages assessed at $5,000.

The criticisms made by counsel upon the testimony of some of the witnesses are not without plausible force, but not of sufficient weight to disturb the master's finding upon any material question of fact; and in respect to the proposition of law, "that the receiver should be charged with notice of the facts that came to the knowledge of his employes, whether upon the east or west division of the road," I am not able to agree with counsel that the master fell into essen-

tial error. I think it must be true, in cases of change of men in charge of passenger trains, like the one made in this instance, that the new men should be informed of everything known to those retiring which ought reasonably to be deemed important to a proper discharge of the carrier's duty. But, while I do not think that the information given in this case by one brakeman to the other was sufficiently full and explicit, I do not deem it necessary so to decide. In my judg-, ment, upon the conduct of the conductor and brakeman who took charge of the train at Vincennes, as shown by their own testimony, the liability of the receiver is put beyond reasonable question. Their testimony shows that the man Haynes was excited, nervous, tremulous, and laboring under the manifestly unfounded delusion of pursuit by enemies, *on the train*, who would rob or kill or harm him in some way, and that in childish but real fear of these things he appealed to the conductor for protection. Whether from excessive drinking or from other cause, it is clear that for the time being the man was insane; and, possessed of a pistol, as he was known to be, the conductor, as a man of common understanding, knowledge, and experience, ought to have apprehended the danger that he might mistake some passenger for his supposed pursuer and shoot him down in imaginary self-defense.

That it was in the lawful power of the conductor, under the circumstances, to have arrested, disarmed, restrained, or removed from the train this man goes without saying. By the common law, and especially by the statutes of this state, ample powers in these respects are conferred upon conductors and other railroad employes. *Vinton* v. *Middlesex R. Co.* 11 Allen, 304; *Railroad Co.* v. *Anthony*, 43 Ind. 183; *Railroad Co.* v. *Van Houten*, 48 Ind. 90; *Railroad Co.* v. *Vandyne*, 57 Ind. 576; *Railroad Co.* v. *Griffin*, 68 Ill. 506; Ind. Rev. St. 1881, §§ 1702, 2091, 3922–3924. By these statutes it is provided that "the conductors of all trains carrying passengers within this state shall be invested with police powers while on duty on their respective trains, may arrest and detain any person found violating any law of this state," and, "when any passenger shall be guilty of disorderly conduct, * * * the conductor is hereby authorized to stop his train at any place where such offense has been committed, and eject such passenger from the train, using only such force as may be necessary to accomplish such removal, and may command the assistance of the employes of the railroad company." "Whoever is found in a public place in a state of intoxication," and "whoever draws, or threatens to use, any pistol, * * * shall be deemed guilty of a misdemeanor." These powers, whether conferred by statute or deduced from the principles of law, are given for the safety of those who travel by railroad, and any failure in a proper case to exercise them, contributing to the injury of a passenger, is a breach of the carrier's contract, for which damages may be allowed. This conclusion is strongly supported by decisions made in analogous cases. cited in ar-

gument, of which see the following: *Railroad Co.* v. *Hinds*, 53 Pa. St. 512; S. C. 7 Amer. Law Reg. (N. S.) 14; *Railroad Co.* v. *Pillow*, 76 Pa. St. 510; S. C. 18 Amer. Rep. 424; *Flint* v. *Transportation Co.* 34 Conn. 554; S. C. 6 Blatchf. 158; *Railroad Co.* v. *Burke*, 53 Miss. 200; S. C. 24 Amer. Rep. 689; *Britton* v. *Railroad Co.* 88 N. C. 536; S. C. 43 Amer. Rep. 749; *Railroad Co.* v. *Flexman*, 103 Ill. 546; *Stewart* v. *Railroad Co.* 90 N. Y. 588; S. C. 43 Amer. Rep. 185.

Exceptions overruled, and judgment upon the report.