L. T. Spinks *v.* New Orleans, Mobile & Chicago
Railroad Co.

[63 South. 190.]

Carriers. *Passengers. Assault by fellow passengers. Negligence of conductor.*

Where the conductor of a railroad train found an intoxicated passenger attempting to leave the train in the dark while the train was running, but making no threats or attempts to injure anyone else, and took him into the baggage car and placed him in charge of the baggage-master and invited two other passengers, who were acquainted with the drunken man, to go into the baggage car and assist in taking care of him, and while in the baggage car one of these passengers was assaulted and cut by the drunken man in the absence of the conductor, under such circumstances there was no negligence on the part of the railroad company and it was not liable in damages to the passenger who was assaulted.

Appeal from the circuit court of Forrest county.
Hon. Paul B. Johnson, Judge.

Suit by L. T. Spinks against the New Orleans, Mobile & Chicago Railroad Company. From a judgment for defendant, plaintiff appeals.

Appellant, having been assaulted by a fellow passenger while traveling on one of appellee's trains, seeks to recover from it damages alleged to have been sus-

tained by him by reason thereof. The court below instructed the jury peremptorily to find for appellee, and there was a verdict accordingly.

The facts are that on the night of May 8, 1911, appellant and a man named McEachin were passengers on one of appellee's trains. This train, in addition to the engine, was composed of a baggage car and two passenger coaches, and was made up in the order named. When the train stopped at New Augusta, a station on the line, it was boarded by a man named McWilliams, who was highly intoxicated, and who, instead of boarding the train at the proper place, got on the platform at the front end of the baggage car, where he was discovered by the baggageman after the train had started and brought into the car. Shortly thereafter he left the baggage car and was discovered by the conductor on the rear platform thereof trying to get off of the train. The conductor caught hold of him, pulled him back from the edge of the platform, and, on discovering his intoxicated condition, carried him again into the baggage car and placed him in the custody of the baggagemaster, intending, according to his (the conductor's) testimony, to put him (McWilliams) off at Mahned, the next station.

Appellant, McEachin, and McWilliams were commercial travelers. McEachin and McWilliams were personal friends, and each of them were acquainted with the conductor. Appellant seems also to have been acquainted, though slightly, with McWilliams. At the time McWililams was placed in the baggage car by the conductor, appellant and McEachin were occupying the same seat in the rear coach. When the conductor reached this coach in the regular discharge of his duties, after leaving McWilliams, he saw McEachin and told him of McWilliams' condition, and asked him to go into the baggage car and see what he could do with him. This McEachin did. Appellant saw the conductor speak to McEachin and McEachin leave the coach, but states that he did not hear

what the conductor said.   McEachin, on entering the baggage car, took McWilliams in charge and told the conductor he would keep him there until the train reached Hattiesburg; this being the station to which all of these parties were bound.   The conductor then examined the baggage which McWilliams had with him, in order to ascertain whether or not it contained a weapon of any kind, but found none.   He did find therein a mileage ticket, and tore therefrom mileage sufficient to cover his (McWilliams') railroad fare to Hattiesburg.   Shortly after this the conductor again went into the rear coach, and, according to his testimony, saw appellant sitting there alone, and, thinking he would like to be with his friend, McEachin said to him to "go up there where Mac is."   Appellant replied, "Why, certainly," and immediately arose and went into the baggage car.

According to appellant, when the conductor came into the rear coach the second time, he told him to come and go with him (the conductor) into the baggage car and "help quiet that drunk;" that he thereupon arose and accompanied him into the baggage car, for the reason that he suppose it was the duty of a passenger to respond to calls of this character made upon them by railroad conductors.   What occurred after this can best be told in appellant's own language, which is as follows:   "I got up and followed him to the baggage car, and I passed him there between the coaches, and he opened the door, and I went on in, and he turned on back, as I was not personally acquainted with him, but I had a sort of acquaintance with him.   When I entered the baggage car, McEachin says:  'Come on, Spinks, and help me take care of this fellow; he is trying to jump off of the train; I have just drug him back off of the platform.'   I said:  'My goodness, Mr. McWilliams, what is the matter?   I had walked up in about three feet of him, and he broke away from McEachin and jumped on me just like a wildcat.   I caught him by the arm, but he was a better man than I was, and

threw me up against the side of the coach, and was trying to bite me. I had hold of his arms, and he shoved me back this way and bit me on the nose. That all happened in just a minute or two, and McEachin grabbed him again, and he bit McEachin on his arms, bit him through his clothes, and McEachin tripped him, and threw him on the floor, and held him there a minute or two. He said to him: 'Mac, I will let you up if you will promise not to cut up this way any more.' That was McEachin said that. He held him down on the floor possibly a minute or two, and I could see his stomach going up and down that way. His clothes were nearly torn off of him. He was in his shirt sleeves, and his shirt was torn, and his flesh exposed. Finally McWilliams got up, and we all three stood there together about a minute in the coach by the window, and about that time the door opened, and the conductor showed up, and just pushed the door open, and looked in, and closed the door, and went on.' . . . We stood there and talked a few minutes, and McWilliams made several threatening demonstrations, and McEachin said to me: 'Look out, Spinks; he is going to get a gun or a knife.' I said: 'No; Mac is all right; he is not going to bother me.' I had hardly got the words out of my mouth when he made a lunge. Q. Who did? A. McWilliams; he made a lunge at McEachin, and McEachin kind of ducked his head down under McWilliams' arm this way, and McWilliams cut him in the shoulder. McEachin said: 'He got me, Spinks; I am stabbed to the hollow.' As the fellow stuck the knife in McEachin, the baggagemaster or the postal clerks, he had a little booth right there in the car, on the side of the car, with a little aisle between it and the baggage car, he jumped out of that little booth, and he and McEachin got the knife out of McWilliams' hand. We were then approaching Hattiesburg, pretty close in to Hattiesburg, and I started to go back and get our baggage."

Blood poison resulted from this bite received by appellant, from which he suffered considerable physical pain,

and by reason of which he was forced to incur some considerable expense, consisting of doctors' bills, sanitorium fees, etc.

*Currie & Currie* and *Whitfield, McNeil & Whitfield,* attorneys for appellant.

*Flowers, Alexander & Whitfield* and *J. T. Brown,* attorneys for appellee.

The record in this case is lost.

Smith, C. J., delivered the opinion of the court.

Appellee's contention is that the peremptory instruction was properly granted for two reasons: (1) Because no negligence on the part of the conductor was shown; and (2) because appellant voluntarily placed himself in a position of danger, and thereby assumed the risk incident thereto.

In *Railroad Co.* v. *Burke,* 53 Miss. 200, 24 Am. Rep. 689, after holding that it was the duty of a conductor to preserve order on his train, and to protect his passengers from injury by fellow passengers, the court proceeded to state that "the announcement of this doctrine for the first time, in its practical application in the jurisprudence of the state, admonishes us that it should be stated with its proper limitations and restrictions. It is first to be observed that the liability of the carrier arises, not from the fact that the passenger has been injured, but from the failure of the officials to afford protection. It will be necessary, therefore, in each case to bring home to the conductor knowledge or opportunity to know that the injury was threatened, and to show that by his prompt intervention he could have prevented or mitigated it. It must be remembered, also, that the power at his disposal consists of the train hands and the willing passengers, that he can never be expected to accomplish anything more than is possible with this force, and that all that can

be required of him, at last, is a fair and honest effort to prevent the wrong. Considering the delicate, and often difficult and dangerous, duties that may devolve upon him, he should be allowed a wide latitude in the means to be employed; and his superiors should never be mulcted in heavy damages where there has been a *bona fide,* though mistaken, attempt to afford protection." In *Royston* v. *Railroad Co.,* 67 Miss. 376, 7 So. 320, and in *Railroad Co.* v. *Minor,* 69 Miss. 710, 11 So. 101, 16 L. R. A. 627, the soundness of this rule announced in *Railroad Co.* v. *Burke, supra,* imposing liability upon a common carrier for injuries inflicted by one of its passengers upon another was doubted, and an emphatic announcement made that, while the court felt "constrained to yield to that decision as authority for the rule it announces," it would "certainly not extend the doctrine so as to embrace any other than the case clearly falling within it."

It may·be, as contended by appellant, that the conductor had the right to eject McWilliams from the train, as to which we express no opinion; but his act in placing him in the baggage car in charge of the baggagemaster, instead of ejecting him from the train, at night, in his then condition, was certainly in accordance with the dictates of humanity, and the conduct to be expected of a reasonable man. His passengers were not thereby endangered, and consequently, in so doing, he failed in no duty to them. The conduct of McWilliams at the time the conductor requested appellant to go into the car and help quiet him, conceding that such request, in fact, was made, had not been such as to indicate that appellant would incur any danger by complying therewith. It cannot, therefore, be said that the conductor knew, or ought to have known, that injury was threatened to or would probably be inflicted upon, appellant. All that McWilliams had then done was to attempt to leave the train, and his conduct indicated that he was dangerous only to himself.

It seems manifest from this record that appellant's injury was not the result of any negligence on the part of

the conductor, but was simply the unexpected result of the very commendable effort of the conductor, appellant, and McEachin to extend to McWilliams that care and protection of which he was then sorely in need. This being true, it is unnecessary for us to consider appellee's second proposition, and we will therefore pretermit any discussion thereof.

*Affirmed.*